1
2
3
4
5
6
7
8          UNITED STATES DISTRICT COURT

9          FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11  ENCARNACION BARRIENTOS,                    No.  1:21-cv-00758-SKO (HC)

12              Petitioner,                    **ORDER DENYING PETITION FOR WRIT
                                               OF HABEAS CORPUS**
13      v.
                                               **ORDER DIRECTING CLERK OF COURT
14  KELLY SANTORO, Warden,                     TO ENTER JUDGMENT AND CLOSE
                                               CASE**
15              Respondent.
                                               **ORDER DECLINING ISSUANCE OF
16                                             CERTIFICATE OF APPEALABILITY**

17

18          Petitioner is a state prisoner proceeding *pro se* and *in forma pauperis* with a petition for

19  writ of habeas corpus pursuant to 28 U.S.C. § 2254.  All parties have consented to the jurisdiction

20  of a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c)(1).  (Docs. 7, 8.)

21          Petitioner is serving a sentence of 38 years in prison after being convicted of active

22  participation in a criminal street gang and heat-of-passion voluntary manslaughter.  He filed the

23  instant habeas action challenging the conviction.  He claims that the trial court erred in instructing

24  the jury, that the jury found the homicide was legally justified thereby absolving Petitioner of

25  guilt, and that defense counsel rendered ineffective assistance.  As discussed below, the Court

26  finds the claims to be without merit.  The petition will be **DENIED.**

27  **I.      PROCEDURAL HISTORY**

28          In September of 2011, Petitioner was charged with premeditated murder with gang

1    enhancements, and active participation in a criminal street gang.  People v. Barrientos, No.

2    F073613, 2020 WL 729189, at *1 (Cal.Ct.App. Feb. 13, 2020), *review denied* (May 13, 2020).

3    Petitioner was convicted by a Kern County jury of second-degree murder and active participation

4    in a criminal street gang.  Id.  The California Court of Appeal, Fifth Appellate District ("Fifth

5    DCA"), reversed the conviction and Petitioner was retried.  Id.  On March 11, 2016, a Kern

6    County jury rendered the following verdict: not guilty as to second degree murder; guilty as to

7    voluntary manslaughter, heat of passion; not guilty as to voluntary manslaughter, imperfect self-

8    defense.  Id.  On April 14, 2016, Petitioner was sentenced to a term of 38 years.  (Doc. 1 at 1.)

9           Petitioner again appealed to the Fifth DCA.  On September 27, 2018, the Fifth DCA

10   affirmed the judgment.  Barrientos, 2020 WL 729189.  Petitioner filed a petition for review in the

11   California Supreme Court.  (Doc. 10-23.)  Review was denied on May 13, 2020.  (Doc. 10-23.)

12          On May 10, 2021, Petitioner filed the instant petition for writ of habeas corpus. (Doc. 1.)

13   On June 25, 2021, Respondent filed an answer to the petition.  (Doc. 11.)  On July 22, 2021,

14   Petitioner filed a traverse. (Doc. 12.)

15   **II.    FACTUAL BACKGROUND**

16          The Court adopts the Statement of Facts in the Fifth DCA's unpublished decision[1]:

17   On November 15, 2010, Cruz Martinez (aka "Bam Bam") was found stabbed to
18   death near the front door of a residence in Bakersfield. A trail of blood led from
     the body to the sliding glass door of another residence a few doors down.

19   *Joseph Ramirez's Testimony*

20   Joseph Ramirez (aka "Tallboy") was Martinez's friend. They both considered
     themselves members of "South Gate Lil Locs." [Fn.2] Martinez thought the "South
21   Side" – apparently a reference to South Gate Lil Locs – was the best gang in town.

22          [Fn.2] Ramirez initially referred to South Gate Lil Locs as a
            "neighborhood."
23

24   In the early morning of November 15, 2010, Ramirez was driving Martinez and
     another friend, Cesar Durado, around southwest Bakersfield. While driving
25   around, they saw two men standing at a corner. Ramirez did not initially recognize
     the men. Martinez said, "Who are these fools?" Martinez then yelled out of the
26   window, "Nutty Nutty South." [Fn.3] Martinez told Ramirez to turn the car

27   ────────────────
     [1] `The Fifth DCA's summary of facts in its unpublished opinion is presumed correct.  28 U.S.C. §§ 2254(d)(2),
28   (e)(1).  Therefore, the Court will adopt the Fifth DCA's summary of the facts.  Moses v. Payne, 555 F.3d 742, 746
     (9th Cir. 2009).

                                                    2

around. Ramirez assumed the two men must have thrown their hands up, which is what made Martinez want to go back. Ramirez initially resisted, but since Martinez was older, Ramirez complied.

[Fn.3] Ramirez said this phrase represented their neighborhood.

Ramirez drove back to the corner where the two men were. Martinez exited the vehicle. One of the men recognized Ramirez and shook his hand, saying, "Wassup?" Ramirez recognized the man as Vicente Adam Perez (aka "Worm"). While Ramirez and Perez were talking, Martinez pulled out a gun. Ramirez said, "Bam, what the f[**]k you doing? Get in the car." Martinez pointed the gun at the second man, who was identified as defendant.

Ramirez later returned to the same corner, alone. He intended to apologize. However, Perez and defendant were mad and kicked the car Ramirez was driving. It looked like defendant began "reaching for something," so Ramirez drove away. As Ramirez drove off, Perez said, "You guys f[**]ked up. That's a big homie. He has Kern County." Ramirez understood that to mean all Sureños in Kern County "answer[ed] to" defendant, who in turn answered to a "higher authority" in the gang hierarchy.

Later that day, Ramirez received a phone call from Luis Montenegro (aka "Playboy"). Montenegro said that Ramirez and Martinez had "f[**]ked up," and they had "two hours to report or they're gonna green-light the South Side." Ramirez understood that to mean there would be violence between gangs. At some point, Ramirez asked someone – he "think[s]" it was Montenegro – where they were to report. Montenegro told him to go to a specific residential address in Bakersfield.

Ramirez went to pick up Martinez. Ramirez yelled at Martinez: "What the f[**]k you doing? You messed up, bro. Like, they want to talk to you now. It's a [sic] old homie. It gets deeper than what you know, so we gotta go try to make this right." Ramirez believed Martinez did not understand the "politics" and "how serious it got."

Montenegro again called Ramirez and told him, "Look. Look, Tallboy. I know you. We done business in the past. Nothing is gonna happen. We just need to talk to him so we can make it right. We're all on the same team." By saying, "We're all on the same team," Montenegro was referring to the fact that they were all Sureños. Montenegro reiterated that if they did not show up, "they're gonna green-light the South Side." Ramirez agreed to go and asked who would be there. Montenegro said he, defendant, and Perez would be there. Ramirez said he would come and bring his uncle Alberto Rodriguez (aka "Bobo"), Durado, and Martinez. Montenegro then told Ramirez he could not bring weapons. Ramirez responded that he could not do that. Montenegro said, "Look, my boy. You have my word, my *palabra*. My word. Varrio Bakers aren't gonna bring no weapons. We just want to talk. We don't want it to be that type of problem." Ramirez then agreed not to bring weapons.

Martinez wanted to bring his gun. Ramirez told Martinez he had given his word that they would not bring weapons.

Ramirez, Martinez, Rodriguez, and Durado went to the address Montenegro had provided. They went into a back bedroom, where they saw defendant, Montenegro, Perez, Adam Velasquez (aka "Mumbles") and "two other dudes." When Ramirez

saw Velasquez and the two other people, he thought "it was gonna go all bad."

Martinez walked up to defendant and apologized. He said, "Dispensa. I don't know who you are. You are who you are, but I'm out here gangbanging." Ramirez testified "dispensa" means "I'm sorry" or "I apologize."

Defendant said, "What? You don't fight?" Martinez responded, "Yeah, I fight. I'm Bam Bam. I'm undefeated in my hood." Ramirez told defendant, "I apologize for my boy. He doesn't really know how deep it really is, and he's gonna – he's here to apologize, to make it right."

Perez then called Ramirez outside. Perez lifted up his shirt to show he had no weapons. Ramirez apologized again for Martinez. Perez told him not to worry and that they were all "on the same team." Perez and Ramirez then made an agreement that they were going to "check" [Fn.4] Martinez for 13 seconds. Ramirez's side also needed to "pay two guns ... [m]aybe like a thousand dollars and a couple ounces of dope." Ramirez understood these requirements to be coming from a "higher authority" and therefore agreed in order to avoid a "green light" being placed on his neighborhood.

[Fn.4] "Checking" refers to "punching" in this context.

After about a minute, Rodriguez came running out of the room and pushed two "dude[s]." Then "they" pulled out guns and pointed them at Ramirez's group. Ramirez "think[s]" one of the men who pulled out a gun was Velasquez, and the other was one of the two "dudes" he did not know. Ramirez pushed Perez out of the way and started running. Ramirez later learned Martinez had been stabbed.

Rodriguez later told Ramirez the following: During the meeting, Martinez had said he was not a Sureño, but instead was a "South Gater." Defendant then asked Martinez if the South Side "is Sureños." Rodriguez said they were all Sureños. Defendant responded, "Well, he just said he's not a Sureño." Rodriguez asked Martinez if that's indeed what he had said. At that point, Martinez began to turn around, and then defendant stabbed him.

*Other Witnesses*

### Alberto Rodriguez

Rodriguez "think[s]" he heard Martinez say "something like": "I'm not a Sureño, but I run the South Side." Rodriguez said that was "[m]ost likely" a disrespectful thing for Martinez to say to a Sureño.

Towards the end of the meeting, Rodriguez heard a "click" that sounded like a gun cocking. He told Ramirez, "They got a gun," and then ran to a nearby alley.

### Jamie Perez

Vicente Adam Perez's sister, Jamie, testified. She said that when Martinez came to the residence for the meeting, he said, "I'm Bam Bam. South Side Loc" and then walked away. He "never shut up after that" and kept saying things like, "South Side Loc. South Side."

After all the attendees went in to the back room, someone locked and closed the door. Jamie sat on a nearby washing machine where she could hear some of what

was being said. She heard Martinez say, "I run the South Side. This is how it's gonna go." Defendant said, "What do you mean you run the South Side?" Martinez replied, "I run the South Side, but I'm not a Sureño." Defendant and Montenegro asked Martinez what he meant by saying he's not a Sureño. Then Rodriguez chimed in, "He is. He is a Southerner. He is a Southerner." "Right after" Rodriguez said that, everyone ran out of the room. When Martinez ran out of the room, he was still screaming, "South Side Loc."

Eventually, Jamie picked up defendant and others in a vehicle. She did not see any injuries or blood on defendant.

*Defendant's Interrogation*

Detectives interrogated defendant after his arrest. At several points, defendant used vague pronouns and a passive voice. Defendant said "they" came to him and asked "somebody" to "step in" on a "little meeting" between the South Side and the Varrio. [Fn.5] Defendant further explained,

> "[T]he Varrio boys felt one of the South Side boys disrespected somebody by pulling the gun out on somebody and shooting him but the gun didn't go off. Uh and he felt, you know he wanted to get back at him. But, he wanted to seriously do some damage to this guy and I thought, I was trying to make it, I was trying to get to where it's like (unintelligible) you know. No harm done, that's it. Leave it alone fool."

> [Fn.5] The South Side Bakers and Varrio Bakers are each Sureño subsets.

Defendant told detectives, "But I guess when the guy came in acting real aggressive and (unintelligible) other people's faces and that's when it got out of hand." "Somebody hit the guy and everybody took off running."
Defendant denied being the murderer and denied that he was the person Martinez had pointed the gun at earlier that morning. Defendant also claimed that Martinez's disrespectful comments at the meeting were not directed at him, saying "[i]t didn't have anything to do with me."

*Defendant's January 17, 2011, Jail Call to Perez's Mother*

The prosecutor played for the jury a recording of a jail phone call between defendant and Perez's mother, Jeanette, on January 17, 2011. On the call, defendant says he heard some people had been calling him a "rat." He said that was inaccurate because he only implicated himself and did not incriminate anyone else. Defendant then said, "You know those, those that were out there (unintelligible) my name up and talking shit about me and I'm a rat whatever, those people better stick to their words because when the smoke clears and everything is said and done .... [¶] I'm, I'm just gonna do everything, everything in my power. I'm gonna talk to whoever it is that I need to talk to and a lot of people are gonna get hurt."

Later, the two began speaking about Rodriguez. The following exchange occurred:

> "[Defendant]: Yeah because see if there's any way that maybe he [Rodriguez] can be found...

> "Jeanette: Uh huh.

5

"[Defendant]: ...uh, that all he has to do-huh? Make it five. Uh, uh, for him, for him to come in and, and tell the truth. You know. All he has to do is come in and tell the truth and all the charges will be dismissed on all of us because it was a self-defense."

"Jeanette: Yeah.

"[Defendant]: You know. And all he has to do is come in and say (unintelligible) you know, exactly what happened that as I was walking out of the room, I turned around to say "that's your homeboy you deal with it" and Bam Bam attacked me. I had no other choice but to defend myself."

*Defendant's Interview on January 21, 2011*

On January 21, 2011, detectives interviewed defendant in custody. [Fn.6] One of the detectives said he received a note that defendant wanted to talk to him.

[Fn.6] A detective Mirandized defendant near the beginning of the interview.

Defendant told detectives that "they passed by in a PT Cruiser ... [¶] ... and they yelled out their neighborhood and I flipped them off cause I found that very disrespectful." Then, "they came back and Bam tried to shoot me."

Defendant told "one of the guys" that if they did not have Martinez at a certain house by a particular time, "I'll put a green light on your whole neighborhood."

Defendant said the plan was to "discipline[ ]" Martinez at the meeting. The plan was not to stab him, but to give him "an ass whipping." Defendant further explained that at the meeting later that day, "Bam" came in, "screaming and hollering and disrespectful and all this shit."

The following exchange occurred:

"[Defendant:] And, and when he came in I was sitting in the chair and he come and he just starts burning off his mouth. You know and I tried to tell him, "You can't be doing that stuff man." He's like, "I'm (inaudible) I do what I do and"- (inaudible) you know I told him as a Sureno, as a Sureno there's rules you know that you have to abide by, you know. There's a certain way that you have [to] carry yourself."

"[Detective:] Right.

"[Defendant:] And, and he's "Well I'm not a Sureno." And I'm like oh f[**]k. You know and I told his homeboy (inaudible).

"[Detective:] Why would he say he's not a Sureno?

"[Defendant:] I have no idea.

"[Detective:] That's disrespectful to bring in the room right?

"[Defendant:] Yeah that's, yeah that's when I, I told-you know I looked at one of his friends. I said "Hey what's up?" And his friend says, "Hey, hey man you're not a Sureno?" And he's like, "No, no." And that's when I was

6

like, "You know what I'm done." And I went to walk out of the house, out of the house. I was like, "Hey man, you know, that's your homeboy. You deal with it." And that's when he came. I don't know if he was coming at me or if he was just trying to get-but he came at me. He was (inaudible) with me and that's when I just swung and hit-you know, he had tried to kill me earlier in the day man, you know, and I, and I, you know, I seriously thought he was gonna you know, so I just swung it one time[ ]" [Fn.7]

[Fn.7] At another point in the interview, defendant offered the following narration:

> "But when he said he wasn't a South Sider, that's when I said, "You know what, I'm washing my hands of this and get the f[* *]k out of here." I'll let his homeboys deal with it and that's what I did. I went to walk out and said "That's your homeboy, you deal with it." But I had the knife in my hand. It wasn't open but it was in my hand. [¶] And, as I, as I was walking out the door this way I was coming, I was going out like this and I go "That's your homeboy, you deal with it." And that's when he came at me and I just turned to the side like this and I flipped, when I turned to the side, I flipped it open and just went like that one time to the chest. And just, I mean I just swung it. I wasn't trying to hit him anywhere. That's just where it hit him."

At several points during the interview, detectives would ask defendant about the involvement of other individuals, but defendant would give responses such as, "I'm just gonna tell you what I did."

At the current trial, defense counsel read into evidence portions of the prior testimony of one of the detectives who interviewed defendant on January 21, 2011. The detective confirmed that he used "ruses" during the interview. In other words, he told defendant things that were not true.

*Defendant's Testimony at the Prior Trial*

Some of defendant's testimony from the prior trial was read into evidence. We summarize that testimony below.

Defendant admitted he is a Sureño gang member.

Defendant was "very upset" about what Martinez had done earlier in the day. He felt disrespected and was angry. Defendant wanted to "seriously do some damage" to Martinez. Defendant was still thinking about those prior events when Martinez came at him immediately before the stabbing. Defendant had "no idea" whether Martinez was moving towards him to attack or to just try to get out of the door. Defendant admitted Martinez never got close enough to hit defendant.

Defendant testified that Martinez was supposed to get an "ass-whoopin'" if he did not apologize. Martinez did apologize during the meeting, so everything was "quashed." However, Martinez later said he was not a Sureño. As a result of that comment, the "ass-whoopin' " was "back on."

Defendant testified that he did not see any weapons in Martinez's hand before stabbing him.

7

*Defendant's Phone Call*

While the present trial was ongoing, defendant made a phone call from jail to unidentified individuals. On the call, defendant said "Tallboy" (Ramirez) and "Droopy Mellow" (Edward Salvador) were going to testify. Defendant told the listener to tell defendant's brother to "gather up all the f[**]ken big heads of family or, or friends and like Vero and, and, all, I want everybody in there looking at him while he's on the stand doing what he's doing." One of the listeners said later, "I'll put the word out there right now."

Law enforcement understood defendant to be requesting that witnesses be intimidated while they testified. As a result, one uniformed member of the Bakersfield Police Department was stationed inside the courtroom for the hearing, and three additional police officers were stationed outside the courtroom. Fortunately, the extra security proved unnecessary as no one showed up to intimidate the witnesses.

*Stipulation Concerning Martinez's Blood Sample*

The parties stipulated that the coroner's toxicology screening indicated that Martinez's "blood sample revealed that [he] had the following drugs in his system:" 60 nanograms per milliliter of amphetamine, 920 nanograms per milliliter of methamphetamine and 66 nanograms per milliliter of Delta-9 THC. The parties further stipulated that blood levels of 200 to 600 nanograms per milliliter of methamphetamine has "been reported in methamphetamine abusers who exhibited violent and irrational behavior. High doses of methamphetamine can also elicit restlessness, confusion, hallucinations, circulatory collapse, and convulsions."

*Gang Evidence*

The parties stipulated that on November 15, 2010, defendant actively participated in the Sureño criminal street gang. The parties further stipulated that when defendant participated in the gang, he knew that members of the gang engage in or have engaged in a pattern of criminal gang activity.

The prosecution also offered additional gang evidence, including the testimony of experts Edward Salvador [Fn.8] and Officer Shane Shaff. Because defendant does not raise any appellate challenges specific to gang evidence, we do not include that testimony here.

> [Fn.8] Salvador testified in exchange for immunity, $900, and a burger. In the past, Salvador received cash and meals in exchange for testimony and other help to law enforcement.

*Verdict Forms*

Immediately before instructing the jury, the court and counsel discussed various issues outside the presence of the jury. Defense counsel said he "wasn't requesting [CALCRIM No.] 570..." – which is the instruction on heat-of-passion voluntary manslaughter. The court said it was going to give the instruction anyway "because I believe I have a duty to give it."

The court and counsel proceeded to discuss other instructions. The discussion then turned to the verdict forms. The court asked defense counsel whether there was, "Any objection to the verdict form other than the defense doesn't want me to give

8

the instruction as to heat of passion?" Defense counsel replied, "No, your Honor."

The jury was subsequently given two verdict forms pertaining to voluntary manslaughter. One of the verdict forms pertained to "Voluntary Manslaughter: Heat of Passion, in violation of Section 192(a) of the Penal Code, a lesser but necessarily included offense in the crime charged in the first count of the Information." Another verdict form pertained to "Voluntary Manslaughter: Imperfect Self-Defense, in violation of Section 192(a) of the Penal Code, a lesser but necessarily included offense in the crime charged in the first count of the Information."

*Jury Instructions*

The court gave the following instructions to the jury, among others:

> "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion.

> "The defendant killed someone because of a sudden quarrel or in the heat of passion if:

>> "1. The defendant was provoked.

>> "2. As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment; and

>> "3. The provocation would have caused a person of average disposition to act rashly without due deliberation, that is, from passion rather than from judgment.

> "Heat of passion does not require anger, rage, or any specific emotion. It can be any violent or intense emotion that causes a person to act without due deliberation and reflection.

> "In order for heat of passion to reduce a murder to voluntary manslaughter, the defendant must have acted under the direct and immediate influence of provocation as I have defined it.

> "While no specific type of provocation is required, slight or remote provocation is not sufficient. Sufficient provocation may occur over a short or long period of time.

> "It's not enough that the defendant was simply provoked. The defendant is not allowed to set up his own standard of conduct.

> "You must decide whether the defendant was provoked and whether the provocation was sufficient. In deciding whether the provocation was sufficient, consider whether a person of average disposition in the same situation and knowing the same facts would have reacted from passion rather than from judgment. If enough time passed between the provocation and the killing for a person of average disposition to, quote, "cool off," unquote, and regain his clear reasoning and judgment, then the killing is not reduced to voluntary manslaughter on that basis.

"The People have the burden of proving beyond a reasonable doubt that the defendant did not kill as a result of a sudden quarrel or in the heat of passion. If the People have not met this burden, you must find the defendant not guilty of murder.

"A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed a person because he acted in imperfect self-defense.

"If you conclude that the defendant acted in complete self-defense, his action was lawful, and you must find him not guilty of any crime.

"The difference between complete self-defense and imperfect self-defense depends on whether the defendant's belief in the need to use deadly force was reasonable.

"The defendant acted in imperfect self-defense if:

"1. The defendant actually believed that he was in imminent danger of being killed or suffering great bodily injury; and:

"2. The defendant actually believed that the immediate use of deadly force was necessary to defend against the danger; but:

"3. At least one of those beliefs was unreasonable."

*Verdicts*

On March 11, 2016, the jury rendered the following verdicts: not guilty as to second degree murder; guilty as to "Voluntary manslaughter, heat of passion, in violation of Section 192(a) of the Penal Code, a lesser but necessarily included offenses in the crime charged in the first count"; not guilty as to "Voluntary manslaughter, imperfect self-defense, in violation of Section 192(a) of the Penal Code, a lesser but necessarily included offense in the crime charged in the first count"; and guilty as to active participation in a criminal street gang. These verdicts were reflected on written verdict forms signed by the jury foreman, pronounced on the record by the clerk, and affirmed by the jury in open court. Defense counsel declined to poll the jurors individually.

Barrientos, 2020 WL 729189, at *1-8.

## III. DISCUSSION

### A. Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 n. 7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution. The challenged conviction arises out of the Kern

County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. § 2254(a); 28 U.S.C.§ 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.  Lindh v. Murphy, 521 U.S. 320 (1997) (holding the AEDPA only applicable to cases filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

B.      Legal Standard of Review

A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless the petitioner can show that the state court's adjudication of his claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003); Williams, 529 U.S. at 412-413.

A state court decision is "contrary to" clearly established federal law "if it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a different result."  Brown v. Payton, 544 U.S. 133, 141 (2005) (citing Williams, 529 U.S. at 405-406).

In Harrington v. Richter, 562 U.S. 86, 101 (2011), the U.S. Supreme Court explained that an "unreasonable application" of federal law is an objective test that turns on "whether it is possible that fairminded jurists could disagree" that the state court decision meets the standards set forth in the AEDPA.  The Supreme Court has "said time and again that 'an unreasonable application of federal law is different from an incorrect application of federal law.'"  Cullen v. Pinholster, 563 U.S. 170, 203 (2011).  Thus, a state prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in

11

existing law beyond any possibility of fairminded disagreement." Harrington, 562 U.S. at 103.

The second prong pertains to state court decisions based on factual findings. Davis v. Woodford, 384 F.3d 628, 637 (9th Cir. 2003) (citing Miller-El v. Cockrell, 537 U.S. 322 (2003)). Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the petitioner's claims "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Wiggins v. Smith, 539 U.S. 510, 520 (2003); Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997). A state court's factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable among reasonable jurists." Jeffries, 114 F.3d at 1500; see Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), cert.denied, Maddox v. Taylor, 543 U.S. 1038 (2004).

To determine whether habeas relief is available under § 2254(d), the federal court looks to the last reasoned state court decision as the basis of the state court's decision. See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions." Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007) (holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness).

C.    Review of Petition

Petitioner raises various claims challenging his conviction. He claims the trial court erred in instructing the jury on heat of passion. He further claims that the trial court erred by giving the jury two verdict forms for voluntary manslaughter: one for heat of passion, and another for imperfect self-defense voluntary manslaughter. He contends that the jury found that he acted in justifiable self-defense when it found him not guilty of imperfect self-defense voluntary manslaughter. Finally, he claims defense counsel rendered ineffective assistance for failing to object to the two voluntary manslaughter verdict forms.

1.      Instructional Error – Heat of Passion

Petitioner first alleges the trial court erred in instructing the jury on heat of passion because the same facts that provide a basis for heat of passion also provide a basis for complete self-defense.  Petitioner raised this claim on direct review in the state courts.  In the last reasoned decision, the Fifth DCA denied the claim as follows:

> *A. Law*
>
> "[T]rial courts must instruct the jury on lesser included offenses of the charged crime if substantial evidence supports the conclusion that the defendant committed the lesser included offense and not the greater offense." (*People v. Gonzalez* (2018) 5 Cal.5th 186, 196.)
>
> Consequently, when there is substantial evidence the defendant killed in the heat of passion, the trial court must instruct on heat-of-passion voluntary manslaughter as a lesser included offense of murder. (See *People v. Breverman* (1998) 19 Cal.4th 142, 153–164.)
>
> In *People v. Wickersham* (1982) 32 Cal.3d 307 (*Wickersham*), disapproved on other grounds in *People v. Barton* (1995) 12 Cal.4th 186, 200–201, the Supreme Court stated, "[A] trial court should not instruct on heat-of-passion voluntary manslaughter where the *same* facts would give rise to a finding of reasonable self-defense." [Fn.9] (Id. at pp. 327–328, italics added, fn. omitted.)
>
>> [Fn.9] In support of this observation, the court cited to several cases, including *People v. Mitchell* (1939) 14 Cal.2d 237, 241–242. In *Mitchell*, the court had found the defendant's testimony did not support a heat-of-passion theory but possibly supported self-defense.
>
> *B. Analysis*
>
> Defendant relies heavily on *Wickersham* in arguing that, in the present case, the "same facts provide the basis for heat-of-passion and self-defense."
>
> However, we read the court's statement in *Wickersham* as precluding heat-of-passion instructions where the *only* plausible provocation would have *necessarily* supported self-defense. In *Wickersham* itself, there was no evidence of provocation except for the victim grabbing a nearby gun immediately before the killing. (*Wickersham, supra*, 32 Cal.3d at p. 327.) The court held that even if that conduct could be considered a "provocation" of some sort, it would also necessarily "give rise to a finding of reasonable self-defense." (*Id.* at p. 328, fn. omitted.) Therefore, a heat-of-passion instruction was not appropriate.
>
> *Wickersham*'s point, we believe, is that the jury cannot circumvent the doctrine of complete self-defense by finding that the victim's act that completely justified a responsive self-defense killing was also a provocation establishing heat-of-passion manslaughter. Otherwise, the jury could convict a defendant of voluntary manslaughter even when he or she acted in complete self-defense. So, when the *only* "provocation" at issue is one that would justify a killing in complete self-defense, the jury should not be instructed on heat-of-passion manslaughter.

Here, there was some evidence consistent with self-defense. For example, defendant said Martinez "came at" him. However, there was *also* evidence of provocation which would support heat-of-passion voluntary manslaughter but not necessarily self-defense. Evidence at trial supported the following inferences: Defendant felt disrespected by Martinez earlier that morning. He was angry and wanted to do "some serious damage" to Martinez. [Fn.10] So, he demanded that Martinez come to a house within 60 minutes, unarmed, or else Martinez's neighborhood would have a "green light" placed on it. At the "meeting," Martinez was screaming, hollering and being "disrespectful" towards defendant, a superior in the Sureño gang hierarchy. Martinez denied even being a Sureño, yet claimed he ran the "south side." According to defendant, Martinez's disrespectful comments meant that Martinez's "ass-whoopin' " was "back on." The stabbing occurred shortly thereafter.

> [Fn.10] Defendant argues the "evidence did not show that [he] was acting in response to the initial incident of disrespect when he stabbed [Martinez]." Not so. In the prior testimony read to the jury, defendant was specifically asked: "At the time that Mr. Martinez was coming at you, did you still have in your mind what had happened on the street?" Defendant responded, "Yes."

Therefore, this case is quite different from *Wickersham* where there was "virtually no evidence of provocation" except conduct completely justifying a self-defense killing. *Wickersham* does not control here. Instead, we uphold the court's instruction under the usual rule that a court must instruct on heat-of-passion voluntary manslaughter where substantial evidence supports it. (See *People v. Breverman*, supra, 19 Cal.4th at pp. 153–164.)

*Barrientos*, 2020 WL 729189, at *8-9.

### a.   Legal Standard

Initially, the Court notes that a claim that a jury instruction violated state law is not cognizable on federal habeas review.  Estelle v. McGuire, 502 U.S. 62, 71-72 (1991).  To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. Id. at 72; Cupp v. Naughten, 414 U.S. 141, 147 (1973); see also Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974) ("'[I]t must be established not merely that the instruction is undesirable, erroneous or even "universally condemned," but that it violated some [constitutional right].'"). The instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. See Estelle, 502 U.S. at 72.  In other words, the court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process.  United States v. Frady, 456 U.S. 152, 169 (1982) (citing Henderson v. Kibbe, 431 U.S. 145, 154 (1977)); Prantil v. California, 843 F.2d 314, 317 (9th Cir.

1988); see, e.g., Middleton v. McNeil, 541 U.S. 433, 434–35 (2004) (*per curiam*) (no reasonable likelihood that jury misled by single contrary instruction on imperfect self-defense defining "imminent peril" where three other instructions correctly stated the law).

In addition, a habeas petitioner is not entitled to relief unless the instructional error "'had substantial and injurious effect or influence in determining the jury's verdict.'" Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)). In other words, state prisoners seeking federal habeas relief may obtain plenary review of constitutional claims of trial error, but are not entitled to habeas relief unless the error resulted in "actual prejudice." Id. (citation omitted); see Calderon v. Coleman, 525 U.S. 141, 146–47 (1998).

### b.      Analysis

The appellate court determined that the trial court correctly instructed the jury on heat of passion in accordance with California law. Petitioner contends that the state court's determination was erroneous. Federal habeas relief is unavailable for Petitioner's claim because a federal court is bound by the state court's determination of state law. Bradshaw v. Richey, 546 U.S. 74, 76 (2005) (*per curiam*).

Petitioner's argument is also meritless. As noted by the state court, there was some evidence consistent with self-defense, but there was also evidence of provocation which would support heat-of-passion voluntary manslaughter. Thus, it was not unreasonable for the trial court to instruct on heat-of-passion. The claim must be rejected.

### 2.      Instructional Error – Two Verdict Forms

Petitioner next claims that the trial court erred by giving the jury two verdict forms for voluntary manslaughter: one for heat-of-passion voluntary manslaughter, and another for imperfect self-defense voluntary manslaughter. He alleges that the jury found the homicide to be legally justified since it found him not guilty of imperfect self-defense voluntary manslaughter. Petitioner also presented this claim on direct review in the state courts. The Fifth DCA rejected the claim as procedurally defaulted:

"An objection to jury verdict forms is generally deemed waived if not raised in the

trial court." [Fn.11] (*People v. Toro* (1989) 47 Cal.3d 966, 976, fn. 6, disapproved on other grounds in *People v. Guiuan* (1998) 18 Cal.4th 558.) Here, defense counsel did not raise the issue of multiple verdict forms for voluntary manslaughter. [Fn.12] Indeed, when specifically asked if he had any objection to the verdict form (apart from a prior objection on the heat-of-passion instruction), defense counsel said, "No, your Honor." Therefore, the issue has not been preserved for review. (See *People v. Jones* (2003) 29 Cal.4th 1229, 1259; *People v. Bolin, supra*, 18 Cal.4th at p. 330; *People v. Webster* (1991) 54 Cal.3d 411, 446.)

> [Fn.11] Section 1259 does permit review of certain "instruction[s] given, refused or modified" without objection below. (§1259.) However, defendant's claim concerning the verdict forms is not one that seeks review of an "instruction given, refused or modified." (*Ibid.*)

> As for defendant's claim of instructional error, we address the merits of that contention. (See, *supra*, Discussion, part I.)

> [Fn.12] Defense counsel did object to the court instructing the jury on heat of passion. But he did not object to the use of two verdict forms for voluntary manslaughter.

> In his appellate brief, defendant claims his counsel requested that the court provide a single voluntary manslaughter verdict form to the jury. However, his citation to the record does not support this claim. Defendant acknowledges that his counsel "did not separately object to the dual verdict forms."

> Defendant also quotes his counsel at sentencing saying: "[I]t seems that if it were not guilty of imperfect self-defense, then they would have found him not guilty of everything because that would be a justified killing." Defendant argues this statement constituted an "objection." Accepting for the moment defendant's characterization of counsel's statement as an objection, we still find forfeiture. Forfeiture occurs when a defendant fails to object to a verdict form "either at the time the court proposed to submit it or when the jury returned its finding." (*People v. Bolin* (1998) 18 Cal.4th 297, 330; see also *People v. Jones* (1997) 58 Cal.App.4th 693, 715 [requiring defendant object to verdict forms "at trial"]; *People v. Gonzales* (1960) 187 Cal.App.2d 769, 772 [forfeiture found when counsel did not request alternate verdict form be submitted to jury nor object to the verdict forms "at the time" they were "submitted to the jury"].) Objecting for the first time at sentencing, well after anything can be done to avoid a second trial, is too late. And even if the purported objection at sentencing were not untimely, we would reject the claim on the merits. It is a technical defect that can be disregarded because the jury's intent to convict on heat-of-passion manslaughter was unmistakably clear. (See *People v. Bolin, supra*, at p. 331.)

Barrientos, 2020 WL 729189, at *9.

    a.    Procedural Default

The state court found that Petitioner had forfeited his claim by failing to object to the jury verdict forms at trial. A federal court will not review a claim of federal constitutional error raised by a state habeas petitioner if the state court determination of the same issue "rests on a state law

1   ground that is independent of the federal question and adequate to support the judgment."

2   Coleman v. Thompson, 501 U.S. 722, 729 (1991).  This rule also applies when the state court's

3   determination is based on the petitioner's failure to comply with procedural requirements, so long

4   as the procedural rule is an adequate and independent basis for the denial of relief.  Id. at 730.

5   For the bar to be "adequate," it must be "clear, consistently applied, and well-established at the

6   time of the [ ] purported default."  Fields v. Calderon, 125 F.3d 757, 762 (9th Cir. 1997).  For the

7   bar to be "independent," it must not be "interwoven with the federal law."  Michigan v. Long, 463

8   U.S. 1032, 1040-41 (1983).  If an issue is procedurally defaulted, a federal court may not consider

9   it unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the

10  alleged violation of federal law, or demonstrate that failure to consider the claims will result in a

11  fundamental miscarriage of justice.  Coleman, 501 U.S. at 749-50.

12          The Ninth Circuit has repeatedly held that California's contemporaneous objection

13  doctrine is clear, well-established, has been consistently applied, and is an adequate and

14  independent state procedural rule.  Melendez v. Pliler, 288 F.3d 1120, 1125 (9th Cir. 2002);

15  Vansickel v. White, 166 F.3d 953 (9th Cir. 1999).  Thus, by failing to object to the verdict forms

16  at trial, Petitioner waived his claim in state court and is procedurally barred from raising it here.

17  In any event, as discussed below, the claim is without merit.

18                  b.      Legal Standard

19          The same standard set forth in the previous claim of instructional error applies here.  To

20  merit relief, Petitioner must show that the ailing instruction by itself so infected the entire trial

21  that the resulting conviction violates due process.  Cupp, 414 U.S. at 147.  The instruction must be

22  considered in the context of the instructions as a whole and the trial record.  See Estelle, 502 U.S.

23  at 72.  Further, Petitioner is not entitled to relief unless the instructional error "'had substantial

24  and injurious effect or influence in determining the jury's verdict.'"  Brecht, 507 U.S. at 637.

25                  c.      Analysis

26          Petitioner contends that the jury essentially determined the killing was justified when it

27  found him not guilty of the offense of imperfect self-defense voluntary manslaughter.  This

28  argument lacks merit.  While it is true the jury found Petitioner not guilty of imperfect self-

17

1    defense voluntary manslaughter, the jury clearly found Petitioner guilty of heat-of-passion

2    voluntary manslaughter.  The jury's intent to find him guilty of heat-of-passion voluntary

3    manslaughter was unmistakably clear because the jury foreman signed the guilty verdict form for

4    heat-of-passion voluntary manslaughter, and the jury affirmed the guilty verdict in open court.

5            Petitioner further claims that the jury was confused by the two verdict forms and did not

6    know that it could acquit him of murder or manslaughter if there was reasonable doubt that the

7    killing was done in self-defense.  This argument is also without merit because the instructions

8    clearly stated that the jury could acquit Petitioner if it found the killing to be justifiable self-

9    defense.  First, the jury was instructed that "[i]f a person kills with a legally valid excuse or

10   justification, that killing is lawful and he has not committed a crime."  (Doc. 10-13 at 80.)

11   Second, the jury was instructed that "[i]f there is no legally valid excuse or justification, the

12   killing is unlawful, and depending on the circumstances, the person is guilty of either murder or

13   manslaughter." (Doc. 10-13 at 80.)  Third, the jury was told: "The defendant is not guilty of

14   murder or manslaughter if he was justified in killing someone in self-defense." (Doc. 10-13 at 80-

15   81.)  Fourth and finally, the jury was advised that "[t]he People have the burden of proving

16   beyond a reasonable doubt that the killing was not justified. . . . If the People have not met this

17   burden, you must find the defendant not guilty of murder or manslaughter."  (Doc. 10-13 at 82.)

18   Thus, the jury was instructed to acquit Petitioner of murder or any form of manslaughter if there

19   was reasonable doubt whether the killing was justified–which they did.  Petitioner fails to show

20   that the state court's rejection of this claim was objectively unreasonable; the claim must be

21   denied.

22           3.      Ineffective Assistance of Counsel

23           In his last claim, Petitioner contends that defense counsel rendered ineffective assistance

24   by failing to object to the two voluntary manslaughter verdict forms.  Petitioner also raised this

25   claim on direct review in the state courts.  In the last reasoned decision, the Fifth DCA denied the

26   claim as follows:

27           Defendant contends his counsel was ineffective for failing to object to the "dual"
             verdict forms.
28

18

To establish prejudicial ineffective assistance of counsel, defendant must show "that counsel's performance was deficient" and that "the deficient performance prejudiced the defense." (*In re Valdez* (2010) 49 Cal.4th 715, 729.)

Establishing prejudice on a claim of ineffective assistance of counsel requires a showing that there is a reasonable probability the outcome would have been different without counsel's errors. (*In re Valdez, supra*, 49 Cal.4th at p. 729.)

"A court need not first determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, that course should be followed." (*Strickland v. Washington* (1984) 466 U.S. 668, 670, accord, *In re Fields* (1990) 51 Cal.3d 1063, 1079.)

Here, defendant cannot show prejudice from the purported failure to object because "[t]echnical defects in a verdict may be disregarded if the jury's intent to convict of a specified offense within the charges is unmistakably clear, and the accused's substantial rights suffered no prejudice." (*People v. Jones* (2003) 29 Cal.4th 1229, 1259.) Here, the jury's intent to convict defendant of heat-of-passion voluntary manslaughter is unmistakably clear. The foreman signed the "guilty" verdict form for heat-of-passion voluntary manslaughter. The clerk of the court read the guilty verdict for heat-of-passion voluntary manslaughter in open court. The jury verbally affirmed the verdict to the court. [Fn.13]

> [Fn.13] Defendant argues the court improperly "accepted" the jury's guilty verdict "over" the not-guilty verdict. Defendant contends the court effectively chose the verdict, rather than the jury. Defendant offers no citations to legal authorities in support of this argument. The guilty verdict on heat-of-passion voluntary manslaughter was clearly the jury's verdict, not a verdict rendered or "chosen" by the trial judge.

The jury's "not guilty" verdict on imperfect self-defense voluntary manslaughter means exactly what it suggests: the jury concluded the elements of imperfect self-defense were not satisfied. It does not negate the jury's clear conclusion that the prosecution *did* prove the elements of heat-of-passion voluntary manslaughter beyond a reasonable doubt.

Defendant argues that if the court had not instructed on heat-of-passion and "gave only a single generic voluntary manslaughter verdict form, the finding that the homicide was justified by self-defense would have resulted in only one determination by the jury – not guilty of voluntary manslaughter." Defendant's premise is faulty; the jury never made a "finding" that the homicide was justified by self-defense. [Fn.14] Rather, the jury unmistakably concluded that defendant *had* committed heat-of-passion voluntary manslaughter *and not* imperfect self-defense manslaughter.

> [Fn.14] Similarly, defendant argues that because the jury found the homicide legally justified, the court was required to discharge him. (See § 199.) Because we conclude the jury did not find the homicide legally justified, we also reject this claim. And because section 199 does not apply, we need not delve into exceptions to the inconsistent verdict rule.

Indeed, the fact that the jurors convicted defendant of heat-of-passion manslaughter shows they did not find the homicide justified by self-defense. The jury was

specifically instructed not to convict defendant of any crime if they found the killing was justified by self-defense. Yet, they convicted defendant of heat-of-passion voluntary manslaughter. Because "we presume jurors understand and follow the instructions they are given" (*People v. Buenrostro* (2018) 6 Cal.5th 367, 431), it is clear the jury rejected defendant's claim of complete self-defense.

Because the jury's intent to convict defendant of heat-of-passion voluntary manslaughter was "unmistakably clear," any technical defects in the verdict forms are ignored. (*People v. Jones, supra*, 29 Cal.4th at p. 1259.) Consequently, defendant cannot establish prejudice.

Barrientos, 2020 WL 729189, at *10-11.

> a.    Legal Standard

Effective assistance of counsel is guaranteed by the Due Process Clause of the Fourteenth Amendment.  Evitts v. Lucey, 469 U.S. 387, 391-405 (1985).  Claims of ineffective assistance of counsel are reviewed according to Strickland's two-pronged test.  Strickland v. Washington, 466 U.S. 668, 687-88 (1984); Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir. 1989); United States v. Birtle, 792 F.2d 846, 847 (9th Cir.1986); see also Penson v. Ohio, 488 U.S. 75 (1988) (holding that where a defendant has been actually or constructively denied the assistance of counsel altogether, the Strickland standard does not apply and prejudice is presumed; the implication is that Strickland does apply where counsel is present but ineffective).

To prevail, Petitioner must show two things.  First, he must establish that counsel's deficient performance fell below an objective standard of reasonableness under prevailing professional norms.  Strickland, 466 U.S. at 687-88.  Second, Petitioner must establish that he suffered prejudice in that there was a reasonable probability that, but for counsel's unprofessional errors, he would have prevailed on appeal. Id. at 694. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome of the trial. Id. The relevant inquiry is not what counsel could have done; it is instead whether the choices made by counsel were reasonable. Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir. 1998).

With the passage of the AEDPA, habeas relief may only be granted if the state-court decision unreasonably applied this general Strickland standard for ineffective assistance. Knowles v. Mirzayance, 556 U.S. 111, 122 (2009).  Accordingly, the question "is not whether a federal court believes the state court's determination under the Strickland standard "was incorrect

but whether that determination was unreasonable–a substantially higher threshold." <u>Schriro v. Landrigan</u>, 550 U.S. 465, 473 (2007); <u>Knowles</u>, 556 U.S. at 123.  In effect, the AEDPA standard is "doubly deferential" because it requires that it be shown not only that the state court determination was erroneous, but also that it was objectively unreasonable.  <u>Yarborough v. Gentry</u>, 540 U.S. 1, 5 (2003).  Moreover, because the <u>Strickland</u> standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.  <u>See Yarborough v. Alvarado</u>, 541 U.S. 652, 664 (2004) ("[E]valuating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.")

> b.      Analysis

The state court correctly analyzed the claim using the <u>Strickland</u> standard.  Therefore, the only question before this Court is whether the application was objectively unreasonable.  The Court finds that it was not.

The state court reasonably determined that Petitioner suffered no prejudice.  The jury did not acquit Petitioner of an unlawful killing as he claims.  As previously stated, the jury was unmistakably clear in its conclusion that Petitioner was guilty of heat-of-passion voluntary manslaughter.  Further, the jury was instructed that it must find Petitioner not guilty of any crime if it determined that the killing was justifiable self-defense.  Thus, there is no reasonable likelihood that the result would have been different had counsel objected to the verdict forms.  The state court's decision was not unreasonable and the claim must be rejected.

# IV.    CERTIFICATE OF APPEALABILITY

A state prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition, and an appeal is only allowed in certain circumstances.  <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 335-336 (2003).  The controlling statute in determining whether to issue a certificate of appealability is 28 U.S.C. § 2253, which provides as follows:

> (a)     In a habeas corpus proceeding or a proceeding under section 2255 before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held.
>
> (b)     There shall be no right of appeal from a final order in a proceeding to test the

validity of a warrant to remove to another district or place for commitment or trial a person charged with a criminal offense against the United States, or to test the validity of such person's detention pending removal proceedings.

(c)    (1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from—

(A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or

(B) the final order in a proceeding under section 2255.

(2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

(3) The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

If a court denies a petitioner's petition, the court may only issue a certificate of appealability when a petitioner makes a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2).  To make a substantial showing, the petitioner must establish that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'"  Slack v. McDaniel, 529 U.S. 473, 484 (2000) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 (1983)).

In the present case, the Court finds that Petitioner has not made the required substantial showing of the denial of a constitutional right to justify the issuance of a certificate of appealability.  Reasonable jurists would not find the Court's determination that Petitioner is not entitled to federal habeas corpus relief debatable, wrong, or deserving of encouragement to proceed further.  Thus, the Court DECLINES to issue a certificate of appealability.

/////

/////

/////

/////

/////

/////

/////

22

V.     **ORDER**

Accordingly, IT IS HEREBY ORDERED:

1)     The Petition for Writ of Habeas Corpus is DENIED with prejudice on the merits;

2)     The Clerk of Court is DIRECTED to enter judgment and close the case; and

3)     The Court DECLINES to issue a certificate of appealability.

IT IS SO ORDERED.

Dated:   **August 20, 2021**                              /s/ *Sheila K. Oberto*
                                                                     UNITED STATES MAGISTRATE JUDGE

23